Filed 5/4/26  In re B.C. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re B.C., a Person Coming Under the Juvenile Court Law | B344672 |
| | (Los Angeles County Super. Ct. Nos. 24CCJP04014, 24CCJP04014A ) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| J.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Kristen Byrdsong, Commissioner.  Affirmed.

J. C., in pro. per., for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

Mother J.C. challenges the juvenile court's jurisdictional findings concerning her son, B.C., as unsupported by substantial evidence. She further contends that the Los Angeles County Department of Children and Family Services (DCFS) and the court violated her due process rights. We deny mother's request for judicial notice and affirm the findings and order of the juvenile court.

## BACKGROUND

### I. Incident and Initial Investigation

On December 21, 2024, mother and B.C. were involved in a collision with a parked car. M other told responding officers that she drank a single glass of wine several hours earlier. However, she failed a field sobriety test and had breathalyzer results of 0.18 and 0.17. DCFS detained B.C. after mother was arrested for driving under the influence. B.C., then four years old, had been in his car seat and was uninjured. He told a social worker that mother had a glass of wine with her boyfriend, A.N., and her "very fast" driving prior to the crash scared him. DCFS released B.C. to father a few hours later.

After her arrest, mother told a social worker that she had a glass of wine with lunch and a glass of wine with A.N. later in the afternoon. Mother said she did not feel intoxicated and would not have driven if she had. Mother also told the social worker she

2

drank only occasionally, and never to the point of being drunk.[1] Mother denied current mental health issues, though she acknowledged that she experienced postpartum depression (PPD) after B.C.'s birth.  Mother expressed concern about B.C. and stated she had not meant to endanger him.  She had no concerns about father's ability to care for him.

Father told a social worker he was "unaware that the mother was drinking to this level." Before B.C. was born, mother drank "a good amount of alcohol," but he never thought she had an alcohol problem.  To father's knowledge, mother drank no more than a glass of wine at a time since B.C.'s birth.  He had no concerns regarding mother's care of B.C. prior to the incident.

## II.    Petition and Initial Hearing

DCFS filed a dependency petition pursuant to Welfare and Institutions Code, section 300, subdivision (b)(1)[2] on December 24, 2024.  Its single count, b-1, alleged that mother endangered B.C. by driving while intoxicated during the December 21 incident.

In the December 23 detention report, DCFS stated that no efforts could have been made to prevent B.C.'s detention due to the emergent nature of the incident.  In an addendum report filed the following day, it recommended that B.C. remain released to father with monitored visits for mother, and that mother participate in services.

---

[1]     The social worker noted that mother smelled of alcohol, and it was "clear that she was under the influence of alcohol" during the interview.

[2]     All undesignated statutory references are to the Welfare and Institutions Code.

At the initial hearing on January 9, 2025, mother's counsel stated that the incident had been "a big wake-up call to mother," who was willing to comply with all court orders. Counsel requested reinstatement of parents' previous 50-50 custody arrangement. Counsel for DCFS and B.C. largely submitted on DCFS's recommendations. The court expressed concern about "the severity of issues and level of intoxication as indicated in the reports," and found a prima facie case that B.C. was a child described by section 300. It further found that substantial danger existed, and that no reasonable means existed to protect B.C. without removal. The court placed B.C. with father and ordered DCFS to provide mother with monitored visitation and referrals for a substance abuse program and individual counseling.

## III. Jurisdiction/Disposition Report

DCFS prepared and filed a jurisdiction/disposition report in advance of the adjudication hearing. It reported that during an in-person meeting on January 6, 2025, mother reiterated that she had a single glass of wine before the incident and felt fine to drive. She had begun participating in daily AA meetings, enrolled in a parenting class, and was looking for a therapist. All her tests for substance use were negative. Visitation monitors reported that mother's visits with B.C. were appropriate and positive. DCFS scheduled an additional interview with mother to discuss the allegations with her counsel present.

DCFS met with father on February 3, 2025. He reported that mother "drank excessively" when they started dating and told him she was an alcoholic in 2019. Father further reported that after B.C. was born, "it was common" for mother to drink "a few glasses" or "half a bottle" of wine on weekends. He added that he "wasn't surprised" when he learned of the current

incident, and expressed concern that A.N. had allowed mother to drive with B.C.

After his interview, father sent a follow-up email reproduced in the report. It stated that "[s]ometime in June or July 2021," mother secretly consumed vodka in the garage, stayed in bed most of the day, and allowed B.C. to fall off the bed while she was supervising him. Father also stated that mother had "a history of mental illness," including "extreme PPD" after B.C.'s birth, at least six suicide attempts, and two voluntary hospitalizations. According to father, mother "was put on various types" of psychotropic medications, but took them "irregularly" because she did not believe she needed them.

## IV.   Amended Petition

Citing "mother's ongoing and unaddressed alcohol issues as well as her history of suicide attempts and hospitalizations," DCFS filed an amended petition on February 7, 2025. It added an allegation under section 300, subdivision (b)(1), count b-2, that B.C. was at risk due to mother's "numerous mental and emotional problems," including suicidal ideation and attempts of self-harm.

## V.   Last Minute Information

In a last minute information filed March 4, 2025, DCFS reported that it met with mother and her counsel on February 14. Mother stated that she had two glasses of wine on the day of the incident: one with lunch, between 1:00 and 1:30 p.m., and a second at approximately 3:00 p.m. She denied being intoxicated and reported she had not had alcohol since her arrest. DCFS noted that mother pled no contest to driving with a blood alcohol content of 0.08 percent and was placed on probation; all other

5

criminal charges and special allegations were dismissed due to the plea negotiations.

Regarding count b-2, mother acknowledged she suffered from "severe" PPD after B.C. was born.  She enrolled in treatment programs and individual counseling, took medication, and was hospitalized in August and December 2020.  Mother reported that during this time, father caused her "severe emotional abuse and trauma" by telling her that she should "just die" and handed her cleaning products to facilitate that.  Mother denied current mental health issues and said she was not currently taking any psychotropic medications.

DCFS noted concerns that mother was "minimizing her alcohol issues as well as her mental health history" and failing to take responsibility for the incident.  It also noted that she was actively participating in an outpatient drug program, individual therapy, and a parenting class.  It recommended that the court sustain the petition and terminate jurisdiction with joint legal custody and sole physical custody to father, in whose care B.C. was "thriving."  DCFS alternatively recommended enhancement services and a case plan including a psychological evaluation.

## VI.    Adjudication and Disposition

The court held the adjudication and disposition hearing on March 5, 2025.  It admitted both sides' exhibits without objection, including DCFS's jurisdiction/disposition report and mother's documentation of her recent intake visit to a psychiatry clinic.  At that visit, mother reported symptoms of depression and anxiety but denied past suicide attempts.  The doctor concluded mother met diagnostic criteria for "adjustment disorder with mixed anxiety and depressed mood" and "alcohol use disorder, in remission."

Mother called her boyfriend A.N. as a witness. He testified that mother had a glass of wine around 3:00 p.m. on the day of the incident. She did not appear intoxicated and he had no concerns about her driving. A.N. testified mother was a "social drinker" who was "very responsible" when she drank; he had never seen her intoxicated and did not believe she had a substance abuse problem. Neither side called any other witnesses.

Mother's counsel argued that DCFS failed to establish B.C. faced a current or future risk of harm. He alternatively argued that if the court took jurisdiction over B.C., it should keep the case open to allow mother the opportunity to reunify. Citing mother's continued denial of alcohol abuse, father's counsel argued that the court should sustain the allegations and close the case. B.C.'s counsel argued that the petition should be sustained as pled and jurisdiction terminated; she expressed concern about mother's minimization of her mental health symptoms and alcohol use. She suggested that the court could add a "rider" to the family law order to give mother an opportunity to continue her services, and mother could seek changes to the family law order upon completing her services. Counsel for DCFS largely "echo[ed] minor's counsel's statements."

The court sustained both allegations. As to count b-1, it found the breathalyzer results persuasive, mother's claims that she drank only one or two glasses of wine "not credible," and A.N.'s testimony "not really relevant." The court found that mother was "minimizing" and found a nexus between her use of alcohol and ongoing risk to B.C. In addressing count b-2, the court cited mother's diagnoses, her "minimization" of mental

7

health issues, her previous hospitalizations, and her previous refusal to take medication.

At disposition, the court found that placing B.C. in mother's home would pose substantial danger to him, and no reasonable means existed to prevent removal "given [mother's] minimization of the accident, her minimization of her use of alcohol, her past use of alcohol, her unresolved mental health issues, her refusal to take medicine, and her inability to address mental health at this time." It declared B.C. a dependent, but immediately terminated jurisdiction with joint legal custody and monitored visits for mother. The court added that mother's rider to the family law order should include completion of a substance abuse program with testing and parenting classes.

The following day, the court recalled the matter to ensure that the rider accurately reflected "what this court feels [mother] needs to address" regarding count b-2. The court added requirements for mother to complete a mental health evaluation, participate in individual therapy, and take all prescribed psychotropic medications. The court overruled mother's counsel's objections to the mental health evaluation and order generally, noting that counsel had been provided with the proposed order several days earlier.

## DISCUSSION

### I.    Sufficiency of the Evidence

Mother argues there was insufficient evidence to support the court's detention of B.C. and its jurisdictional findings. Mother's arguments regarding the detention hearing are moot at this juncture. (See *In re Richard D.* (1972) 23 Cal.App.3d 592, 595; *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1414.) However, we consider her contentions that the court erred at

8

jurisdiction by relying on hearsay evidence contained in the jurisdiction/disposition report, particularly father's email, and discounting her evidence and counsel's arguments.

### A. Standard of Review

"'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

### B. Analysis

A child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of ... failure or inability of the child's parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).) To show the child faces a risk of harm at the time of the jurisdiction hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 136, abrogated on other grounds by *In re R.T.*, *supra*, 3 Cal.5th at p. 628.) However, "[t]he juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence that the child is at risk of future harm from the parent's . . . conduct." (*In re Yolanda L.* (2017) 7

Cal.App.5th 987, 993.) The court may consider past events as an indicator of whether the child faces a current risk of harm because "[a] parent's past conduct is a good predictor of future behavior." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) A parent's denial of wrongdoing or failure to recognize the negative impact of their conduct is also relevant to determining risk under section 300 (*In re A.F.* (2016) 3 Cal.App.5th 283, 293; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036), because "[o]ne cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

The record here contains sufficient evidence to support the court's jurisdictional findings. Despite mother's contentions to the contrary, as a general rule a "social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based." (§ 355, subd. (b).) Had mother's counsel timely objected to specific hearsay evidence contained in the jurisdiction/disposition report, such as father's email, that evidence would "not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based" without a further showing by DCFS. (§ 355, subd. (c)(1).) No such objection was raised. The juvenile court accordingly was permitted to rely on the email and other evidence contained in the jurisdiction/disposition report.

As to the b-1 count, the record contains evidence showing that mother struggled with alcohol use, including father's email and her recent diagnosis of alcohol use disorder. It also contains evidence that mother transported B.C. while her blood alcohol content was more than twice the legal limit, and continued to minimize her conduct. Mother points to A.N.'s testimony that she

10

was not intoxicated, and asserts that her ability to properly restrain B.C. in his car seat further demonstrates that she was not as intoxicated as indicated by the arresting officer, breathalyzer test, and interviewing social worker. The relative weight to give evidence in the record was a question for the juvenile court; we "do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or reweigh the evidence." (*In re Collin E.* (2018) 25 Cal.App.5th 647, 661.)

Relying on *In re Joaquin C.* (2017) 15 Cal.App.5th 537, and *In re N.R.* (2023) 15 Cal.5th 520, mother argues that DFCS failed to prove that her alcohol abuse placed B.C. at risk or rendered her incapable of caring for him. Both *In re Joaquin C.* and *In re N.R.* support the proposition that proof of substance abuse or mental illness alone does not support jurisdiction. (See *In re Joaquin C.*, *supra*, 15 Cal.App.5th at pp. 564-565 [mental illness]; *In re N.R.*, *supra*, 15 Cal.5th at p. 556 [substance abuse].) They do not, however, establish that DCFS failed to prove that mother's substance abuse placed B.C. at substantial risk in this case. Driving under the influence with a child in the car places the child at substantial risk of future harm, particularly where the parent continues to minimize their conduct "despite evidence of significant intoxication." (*In re M.R.* (2017) 8 Cal.App.5th 101, 109; see also *In re L.W.* (2019) 32 Cal.App.5th 840, 850.) The parent's "understanding of and attitude toward the past conduct that endangered a child" is a relevant jurisdictional factor (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1026), and mother continued to demonstrate a limited understanding of the incident's severity despite her active participation in services and positive visitation with B.C. Contra *In re R.L.* (2025) 115 Cal.App.5th 221 [affirming dismissal of dependency petition after isolated drunk

11

driving incident where juvenile court found parents "understand what they did was irresponsible" and were "likely scared straight"].)

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; see also *In re D.P.* (2023) 14 Cal.5th 266, 283.)  We accordingly do not reach mother's arguments regarding the b-2 count.

## II.    Due Process Violations

Mother argues that DCFS, opposing counsel, and the juvenile court "were prejudiced in their arguments and conclusions" throughout the proceedings.  She further contends they violated her due process rights by improperly admitting hospital records, obstructing her counsel's right to object, and deciding the case in advance of the jurisdictional hearing.[3]

---

[3]    In connection with the latter argument, mother has requested judicial notice of documents she claims establish that the outcome of the hearing was predetermined, including annotated minute orders and an email.  DCFS opposes the motion, which we deny. The documents are not appropriate for judicial notice.  (See Evid. Code, §§ 450, 451, 452, 453, 459.)  We previously granted DCFS's motion to strike the same documents and references thereto from mother's opening brief.  In accordance with that previous ruling, we do not address mother's arguments regarding the annotated minute orders.

Parents have a compelling interest in the companionship, care, custody, and management of their children. The state accordingly must provide them with adequate notice and an opportunity to be heard before depriving them of this interest. (*In re S.V.* (2022) 86 Cal.App.5th 1036, 1038; see also *In re Crystal J.* (1993) 12 Cal.App.4th 407, 412-413.) Due process requires that court proceedings comport with fundamental principles of fairness and decency, though the concept is flexible. (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 536.) The due process clause "sets an exceptionally stringent standard" for establishing judicial bias amounting to a due process violation. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589.) "Numerous and continuous rulings against a party are not grounds for a finding of bias." (*Ibid.*)

The record does not support mother's claims that her due process rights were violated. As discussed above, the juvenile court was entitled to rely upon the hearsay evidence contained in DCFS's reports. Mother asserts that DCFS's counsel and the court also improperly relied upon "hospital paperwork," but it appears from the context of counsel's argument—which is not evidence—that he was referring to mother's exhibit documenting her recent visit to the psychiatrist. There is also no impropriety in the court's late addition of a mental health evaluation to mother's rider. DCFS recommended such an evaluation in its last minute information, and mother's counsel was given the opportunity to object to the proposed order, but did not do so.

To the extent mother claims the allegations against her were unfounded, she has not pointed to anything in the record

13

indicating that she did not have a full and fair opportunity to contest them. To the contrary, DCFS interviewed mother with her counsel present, and the court admitted and considered her testimonial and documentary evidence. The court's evidentiary rulings on mother's counsel's objections and its rejection of A.N.'s testimony do not demonstrate bias. Nor does its reliance on her minimization of case issues indicate, as mother contends, an attempt "to openly extort a desired confession from [mother] in return for favorable outcomes." As discussed above, a parent's failure to acknowledge a problem is relevant to determining risk to their child.

Further process is also available to mother. As both B.C.'s counsel and DCFS's counsel recognized during argument, mother can "seek changes to the family law order in family court when she has completed the services."

## DISPOSITION

The findings and order of the juvenile court are affirmed. Mother's request for judicial notice is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COGLIATI, J.*

We concur:

ZUKIN, P. J.                                    TAMZARIAN, J.

---

* Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.